UNITED STATES of America, Plaintiff–Appellee,

v.

Roberto RAMOS (87–3921), Carl Sutton, Jr. (87–3922), and Ralph Longmire (87–3923), Defendants–Appellants.

Nos. 87–3921 to 87–3923.

United States Court of Appeals, Sixth Circuit.

Argued July 18, 1988.

Decided Nov. 14, 1988.

Rehearing and Rehearing En Banc in Nos. 87–3922 and 87–3923 Jan. 5, 1989.

William Whalen, Jr., Cincinnati, Ohio, for Ramos.

Terry Lehman (argued), Asst. U.S. Atty., Cincinnati, Ohio, Robert C. Brichler, Asst. U.S. Atty., for the U.S.

Richard Spencer, Jr. (argued), Spencer & Perez, Cincinnati, Ohio, for Sutton.

Robert A. Perez (argued), Spencer & Perez, Cincinnati, Ohio, for Longmire.

Before MERRITT, KRUPANSKY and BOGGS, Circuit Judges.

KRUPANSKY, Circuit Judge.

This case represents a consolidated appeal by three defendants (referred to collectively as defendants), each of whom was convicted of criminal charges relating to the possession of cocaine. Defendant-appellant, Roberto Ramos (Ramos), was indicted and convicted of one count of possession with intent to distribute cocaine in violation of 21 U.S.C.A. §§ 841(a)(1) (West 1981) and (b)(1)(B)(ii)(II) (West Supp.1988), and one count of conspiracy to distribute cocaine in violation of 21 U.S.C.A. § 846 (West Supp.1988). Defendant-appellant, Carl Sutton, Jr. (Sutton), was indicted and convicted of one count of attempting to possess with intent to distribute cocaine in violation of 21 U.S.C.A. §§ 841(a)(1) and (b)(1)(B)(ii)(II) and 21 U.S.C.A. § 846, and one count of conspiracy to distribute cocaine in violation of 21 U.S.C.A. § 846. Defendant-appellant, Ralph Longmire (Longmire), was indicted and convicted on one count of using a telephone to facilitate the commission of a felony, namely the attempted distribution of cocaine, one count of attempting to possess with intent to distribute cocaine in violation of 21 U.S.C.A. § 841(a)(1) and (b)(1)(B)(ii)(II) and 21 U.S.C.A. § 846, and one count of conspiracy to distribute cocaine in violation of 21 U.S.C.A. § 846.

The errors charged on appeal by all three defendants stem from the same underlying core of facts as developed during the trial.

Agents employed by the federal Drug Enforcement Administration and the Regional Enforcement Narcotics Unit initiated the surveillance of an apartment belonging to Ramos located at 8105 Constitution Drive in Cincinnati, Ohio on April 13, 1987. On that same afternoon, the officers observed a vehicle bearing New York state license plates park in front of the apartment. There were two individuals inside the vehicle, later identified as Felix Rodriguez (Rodriguez) and Guillermo Agramonte (Agramonte). Rodriguez and Agramonte entered the Ramos apartment, carrying a plastic shopping bag which, it was later determined, contained several packages of cocaine.

Contemporaneously, at about 3:00 p.m., law enforcement officers who had previously obtained a search warrant entered the apartment. Upon entering, the officers placed Ramos, Rodriguez and Agramonte under arrest. The officers proceeded to search the apartment and located a kilogram of 90% pure cocaine, as well as two smaller one ounce packages of cocaine, in one of the bedroom closets.

The search also produced a briefcase owned by Ramos containing $4,970.00 in United States currency, a triple beam scale of the type used for weighing drugs, and the plastic shopping bag which Rodriguez and Agramonte brought from their vehicle. In addition, the officers found several notebooks and writing pads belonging to Ramos, with various mathematical calculations and telephone numbers.

After being placed under arrest, Ramos decided to cooperate with the enforcement agents, and agreed to distribute the cocaine in accordance with his usual *modus operandi*. Ramos accordingly telephoned Longmire and advised him that a shipment of cocaine had arrived. Longmire told Ramos that he would rendezvous with Sutton and that the two would then accept delivery of the shipment from Ramos at his apartment.

Subsequent to this telephone conversation, but before Longmire and Sutton had arrived at his apartment, Ramos received a telephone call from a person whom he identified as Simone Iglesias (Iglesias), and for whom he had collected money on April 10, 1987 for cocaine sales. Iglesias inquired as to whether Rodriguez and Agramonte had arrived safely with the shipment of cocaine. After being assured of the safe receipt of the cocaine, Iglesias instructed Ramos to collect money from Longmire and Sutton, which the two owed him for previous cocaine transactions, before delivering the latest shipment to them.

Sometime after receiving this call from Iglesias, Longmire and Sutton arrived at the Ramos apartment. Law enforcement officers monitored the ensuing conversation between Ramos, Longmire and Sutton from adjacent apartments and a hallway closet. Shortly after entering the apartment, Longmire asked Ramos if he had received the cocaine from Rodriguez and Agramonte. Ramos responded, in accordance with the instructions given to him by Iglesias, by pressing Longmire for the money due from the previous cocaine deliveries. Sutton offered ten thousand dollars which he had immediately available in a brief case in the trunk of his vehicle. Sutton instructed Longmire to get the money. Longmire told Sutton to calm down, observing that he had been out "all night collecting ... money," pursuant to Sutton's instructions.

At this time, Ramos left the room, obtained the cocaine and returned to the living room so that Longmire and Sutton could inspect it. Longmire commented that "[t]his sure is packed. It's packed real tight." At that point, the enforcement officers appeared, identified themselves, and arrested Sutton and Longmire.

After placing Longmire and Sutton under arrest, the officers obtained a search warrant for Longmire's vehicle. Upon searching the trunk of the automobile, they discovered a briefcase belonging to Sutton, which contained $12,000 in cash and various papers. Subsequent laboratory analysis indicated that the bills, which were banded together, contained traces of cocaine. Additionally, the briefcase disclosed a personalized telephone directory and a scrap of paper upon which appeared the

name and telephone number of Escubio Martinez (Martinez), an unindicted co-conspirator who had been supplying Ramos with cocaine from a base of operation in New York. A search of the front passenger area of the vehicle yielded papers with mathematical calculations and various telephone numbers.

The information provided by the various papers collected from Ramos, Longmire, and Sutton disclosed an ongoing arrangement to distribute cocaine. The notebook belonging to Longmire, which had been recovered during the search of his vehicle, provided figures which detailed cocaine sales and payments made for some seven or eight months, including an outstanding debt of $52,900.00. The Martinez telephone number was also found in papers belonging to both Longmire and Sutton.

The papers located in Ramos's apartment included a notation of a debt in the amount of $52,900.00 to Martinez from Longmire and Sutton for previous cocaine sales. Notations were located in a notebook taken from Ramos indicating indebtedness for earlier cocaine sales. Additional entries reflected payments made for two kilograms of cocaine, shipped by Martinez to Ramos in Cincinnati and sold by Ramos to Longmire and Sutton. Residential and employment telephone listings for Longmire, Sutton, Martinez and Iglesias were located in the apartment. Later investigations disclosed payments which Ramos had made to Martinez and Iglesias in the New York area via Western Union. Finally, it was determined from the rental application form for the apartment that it had been leased to Martinez, with Sutton listed as his employer. The telephone service was also listed to Martinez.

The three defendants were jointly tried before a jury in the United States District Court for the Southern District of Ohio. The jury was given its instructions by the court on August 4, 1987, and the alternate jurors were discharged without objection. At the end of the day, the jury was released for the evening following appropriate cautionary instructions by the district judge. As one of the Assistant United States Attorneys was exiting the courtroom, he observed Sandy Halasz, the wife of Steven Halasz, one of the jurors, embrace Longmire's wife. The next morning, after leaving her husband, who entered the jury deliberation room, Sandy Halasz was observed conversing with Longmire and his wife. It was then learned that Sandy Halasz had been observed in the witness room prior to the commencement of the jury's deliberations speaking with Longmire and his wife, and had previously been seen talking to a law clerk for one of the defense counsel.

The Assistant United States Attorney reported these incidents to the district judge and defense counsel whereupon an investigation was undertaken by the court. Sandy Halasz was interrogated by the judge in his chambers in the presence of counsel. She admitted to the reported incidents and explained that upon inquiry from her husband she told him that during the trial, she occupied herself by relaxing in the witness room, where she had on several occasions chatted with the Longmires who had, from time to time, entered the area. She also stated that she had not disclosed the substance of any of these conversations to her husband, who had never inquired about them.

The trial judge verified Sandy Halasz's statements with her husband, Steven, who corroborated his wife's responses to the court and stated further that the only information which his wife had disclosed to him was that she had been conversing with the Longmires in the witness room. He also assured the court that he had not discussed the substance of the jury's deliberations with his wife.

After examining both Steven and Sandy Halasz, the judge conferred with counsel and determined to remove Steven Halasz from the jury and to accept a verdict from the remaining eleven jurors, pursuant to the discretionary authority accorded him under Federal Rule of Criminal Procedure 29(b).

On August 25, 1987, the jury returned guilty verdicts against each of the defendants on all counts of the indictment. Ra-

mos was sentenced to five years incarceration on the conspiracy count, and five years on the possession of cocaine charge, to be served consecutively. Longmire was sentenced to five years imprisonment on the conspiracy charge, four years imprisonment on the telephone charge, and five years on the attempted possession of cocaine charge, the first six months of which were to be served consecutively to the other two sentences, while the remainder of the time was to be served concurrently. Sutton was sentenced to twenty years imprisonment on the conspiracy count, and twenty years incarceration on the attempted possession of cocaine count, to be served concurrently.

All three defendants filed timely notices of appeal, which were consolidated for hearing before this court.

■ On appeal, the defendants charged that the district court improperly permitted evidence at the trial describing events which had occurred after Ramos had been taken into custody, arguing that such evidence was inadmissible because those actions occurred after Ramos had been arrested and after he undertook to cooperate with the police authorities and therefore were not in furtherance of any conspiracy that may have existed between the parties. However, existing precedent dictates that where one conspirator has been arrested or has agreed to cooperate with the authorities, the subsequent actions of other co-conspirators are admissible against all the participants, including the previously arrested member of the conspiracy. *United States v. Wentz*, 456 F.2d 634, 637 (9th Cir.1972) ("An unarrested co-conspirator still operating in furtherance of the conspiracy may say and do things which may be introduced against the arrested one if the conspiracy is still in operation."); *accord United States v. Hamilton*, 689 F.2d 1262, 1269 (6th Cir.1982) ("[W]here, as here, the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting 'under the direction and surveillance of government agents to obtain evidence against the co-conspirators.'") (quoting *United States v. Cohen*, 197 F.2d 26, 29 (3rd Cir.1952)), *cert. denied sub nom. Wright v. United States*, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983); *United States v. Thompson*, 533 F.2d 1006, 1010 (6th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976). The objection to the evidence relating to activities occurring after the arrest of Ramos is thus without merit.

■ The defendants also urged that the district court erred in dismissing a juror after the jury had commenced its deliberations and by accepting a verdict against the defendants from eleven jurors, thereby depriving the defendants of their right to a unanimous verdict of a twelve member jury mandated in a criminal case. *See United States v. Brown*, 823 F.2d 591, 595 (D.C. Cir.1987) ("In *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), five members of the Supreme Court interpreted this amendment to endow a federal criminal defendant with the right to a unanimous verdict."); *United States v. Essex*, 734 F.2d 832, 840–41 (D.C.Cir.1984); *see also* Fed.R.Crim.P. 31(a) ("The verdict shall be unanimous."). In 1983, the Federal Rules of Criminal Procedure were amended to specifically permit the district courts to conclude a trial in progress with an eleven-member jury in any case where the district court, in the scope of its discretion, had determined that there was just cause to excuse one of the sitting jurors.

> Even absent ... stipulation [by the parties to the criminal case], if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

Fed.R.Crim.P. 23(b) (as amended effective August 1, 1983).

The defendants have suggested that the district court failed to comply with the terms of Rule 23(b) because it made no explicit factual finding of record to support a conclusion that it was "necessary to excuse a juror for just cause." Fed.R.

Crim.P. 23(b). This argument is unfounded. The record clearly reflected that, subsequent to being advised of a potential irregularity during the jury's deliberations, the district judge conducted a hearing pursuant to the teachings of *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), and interviewed both the wife of the juror and the juror himself in the presence of counsel. *See United States v. Pennell*, 737 F.2d 521, 534 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *see also Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982); *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir.1985), *cert. denied sub nom. Brooks v. United States*, 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986). The district court, only after completing its inquiry into the incident, concluded that there was sufficient information to support a finding of potential impropriety, justifying the dismissal of Steven Halasz and acceptance of a verdict from the remaining eleven members of the jury, pursuant to Rule 23(b).

The court's procedure was in accordance with pronounced judicial protocol and its decision to excuse a juror, and to continue with eleven remaining members of the jury, pursuant to the dictates of Rule 23(b), was within the sound discretion of the trial court. *See United States v. Armijo*, 834 F.2d 132, 135 (8th Cir.1987) ("[t]he matter is left to the discretion of the trial court."); *United States v. Brown*, 823 F.2d 591, 597 (D.C.Cir.1987) ("Courts may use Rule 23(b) in many circumstances to discharge a juror."); *United States v. Stratton*, 779 F.2d 820, 832 (2nd Cir.1985) ("We read the 'just cause' standard ... broadly to encompass a variety of temporary problems that may arise during jury deliberations, confronting the trial judge with the need to exercise sound discretion as to the procedure to be followed at a particularly sensitive stage of the trial.") (dismissal of juror who ex-

pressed desire to attend religious ceremonies); *United States v. Gambino*, 788 F.2d 938, 946–49 (3rd Cir.) (removal of juror who was inadvertently exposed to materials not submitted into evidence upheld as within scope of trial court's discretion), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986); *accord United States v. Molinares Charris*, 822 F.2d 1213, 1223 (1st Cir.1987) ("We should not be quick to second-guess a trial judge, who was in a better position than we are to assess the severity of the situation."); *accord Shackelford*, 777 F.2d at 1145 ("[T]he trial judge is in the best position to determine the nature and extent of alleged jury misconduct ...."); *Pennell*, 737 F.2d at 533–34 (district court's determination to "grant a mistrial after investigating allegations of unauthorized contact with jurors should be reviewed only for abuse of discretion" in light of district judge's ability to assess juror's demeanor); *cf. United States v. Griffith*, 756 F.2d 1244, 1252 (6th Cir.) ("[O]n appeal the judge's decision whether to grant a mistrial because of the jury's use of or exposure to extraneous matter will be reviewed only for abuse of discretion."), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985); *United States v. Campbell*, 845 F.2d 782, 785–86 (8th Cir. 1988) (no abuse of discretion where juror excused before jury had begun its deliberations due to connection between juror's in-laws and defendant), *petition for cert. filed*, 57 U.S.L.W. 3062 (U.S. July 8, 1988).

■ The defendants have also charged error to the district court for its failure to have granted the defendants' motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(a),[1] because the government had failed to present sufficient evidence to sustain a conviction on any of the criminal charges. The district court, however, inadvertently overlooked ruling upon the motion for acquittal. "Although courts have uniformly recognized that it is error to reserve ruling on a Rule 29(a) motion

---

1. The rule reads, in pertinent part, as follows:
   **(a) Motion Before Submission to Jury....** The court on motion of a defendant ... shall order the entry of judgment of acquittal of one or more offenses charged in the indict-

ment ... after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. Fed.R.Crim.P. 29(a).

made at the close of the government's case in chief, they have also held that *the error is harmless* if at the close of the government's case in chief the evidence viewed in the light most favorable to the government was sufficient to permit submission of the case to the jury." *United States v. Reifsteck,* 841 F.2d 701, 703 (6th Cir.1988) (emphasis added); *accord United States v. Rhodes,* 631 F.2d 43, 45 (5th Cir.1980) ("[I]f the trial court erroneously defers ruling on the motion for acquittal and the defendant presents evidence, the appellate court in reviewing the sufficiency of the evidence will only consider the evidence presented in the Government's case-in-chief."). Viewing the evidence presented by the government in its case-in-chief in the light most favorable to the government, there was more than sufficient evidence to have supported a conviction on each of the counts alleged in the indictment against each of the defendants.

The evidence in the instant case demonstrated that Ramos was engaged in a long-standing and ongoing conspiracy with both Longmire and Sutton to possess and to distribute cocaine. The sting operation which occurred in the apartment of Ramos on the afternoon of April 13, 1987 provided direct evidence of sufficient weight to prove the existence of such a conspiracy. In addition, the documentary materials which were disclosed as a result of the search of the Ramos apartment and Longmire's vehicle, including various notations, receipts and telephone numbers along with a large amount of cash, would have permitted a jury to have concluded that Ramos had been receiving cocaine for several months from sources in New York, and had been distributing that cocaine through Longmire and Sutton, and had been instrumental in collecting the money for the sale of this drug.

Similarly, the attempted possession of cocaine charge against Longmire and Sutton, pursuant to 21 U.S.C.A. § 846, was supported by evidence which demonstrated that Longmire and Sutton responded within one hour to a telephone call from Ramos advising them of a newly arrived shipment of cocaine. Additionally, a search of Longmire's automobile revealed a large amount of cash, sufficient to pay their indebtedness for earlier purchases of cocaine, together with papers which disclosed schedules of previous cocaine deliveries as well as payments for past transactions, along with telephone numbers of other co-conspirators. *See United States v. Williams,* 704 F.2d 315, 321 (6th Cir.) (sufficient evidence to withstand motion for acquittal where defendant "actively solicited a narcotics sale by telephone and within a short time interval voluntarily appeared at the ... residence ... with a weapon and a substantial amount of cash to consummate the purchase...."), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983); *accord United States v. Manley,* 632 F.2d 978, 987 (2nd Cir.1980) (sufficient evidence to support conviction for attempt to possess narcotics when the defendant was present in a residence of an acquaintance where cocaine was discovered and the defendant possessed a sum of currency roughly equivalent to the purchase price of a quantity of cocaine discovered upon a scale), *cert. denied sub nom. Williams v. United States,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). The initial search of the Ramos apartment produced a kilogram of 90% pure cocaine, which presented sufficient evidence to have convicted Ramos for possession of cocaine. Finally, the phone call between Ramos and Longmire, monitored by the federal agents, was adequate to have permitted the jury to convict Longmire on the use of the telephone to further the conspiracy charge against him.

■ The defendants have also alleged that the district court erred in permitting one of the enforcement officers who testified at trial to comment on certain statements made by Ramos to the officer after his arrest. Ramos did not testify at the trial, which prompted the district court to caution the government to avoid any reference to the Ramos confession during the trial, to conform with *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20

L.Ed.2d 476 (1968) and its progeny.[2]

During the course of direct examination, the government was faithful to the district court's admonition. Upon the government's request, the court also cautioned defense counsel from implicating the Ramos confession through statements made to enforcement agents on cross-examination. At several points during cross-examination of an enforcement agent, however, defense counsel attempted to explore the previous relationship that Ramos may have had with the remaining defendants. The court again cautioned defense counsel that "if you persist in innuendos [relating to the confession of Ramos], you may very well be opening the door."

In spite of these repeated admonitions by the trial court, defense counsel continued to press the enforcement agent about information conveyed to him that involved Longmire or Sutton in the sale or distribution of cocaine prior to their meeting with Ramos in the latter's apartment. After defense counsel had implicated the Ramos confession on cross-examination, the government attempted, during redirect examination, to clarify any misconception created by the defense counsel's interrogation during cross-examination. Specifically, the government asked the agent if Ramos had ever identified his buyers, to which the agent responded that Ramos had identified Longmire and Sutton as his customers. Defendants' counsel objected to the statement and requested a cautionary instruction, pursuant to the *Bruton* doctrine, that a confession given by a co-conspirator who did not testify at trial was inadmissible against anyone except the confessing party. The district court overruled the objection and refused the motion for the cautionary instruction, concluding that the testimony was admissible and that the instruction was not necessary.

On appeal, the defendants have charged that the district court's refusal to exclude this testimony and to give the instruction was reversible error. The Supreme Court has indicated that, where the testimony in question does not constitute impermissible hearsay, permitting the statement to be admitted into evidence does not violate any right of confrontation under *Bruton*. See, e.g., *Bartle*, 835 F.2d at 651 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985) and *Bourjaily v. United States*, 483 U.S. 171, ——, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987)). In the case at bar, the statement in question did not violate the standard in *Bruton* because counsel for the defendant, on cross-examination, had opened the door for the government's line of inquiry.

We cannot say that the district judge abused his discretion in deciding that the redirect testimony was relevant in light of the defense's cross-examination. Defense counsel opened the door by inquiring into the relationship between Agent Lopez and Hardin. They cannot now complain on appeal because Lopez was given the opportunity to further explain the reason for his dealings with Hardin. As we have noted in the past, "[w]hen a

---

**2.** The Supreme Court recently summarized its holding in *Bruton* in the following language:

> In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), we held that a defendant is deprived of his rights under the Confrontation Clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.
>
> \* \* \* \* \* \*
>
> The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." We have held that that guarantee, extended against the States by the Fourteenth Amendment, includes the right to cross-examine witnesses.... Where two or more defendants are tried jointly, therefore, the pretrial confession of one of them that implicates the others is not admissible against the others unless the confessing defendant waives his Fifth Amendment rights so as to permit cross-examination.

*Cruz v. New York*, 481 U.S. 186, 187–88, 189–90, 107 S.Ct. 1714, 1716–17, 95 L.Ed.2d 162 (1987) (citation omitted); *accord United States v. Bartle*, 835 F.2d 646, 651 (6th Cir.1987) ("[I]n a joint trial of codefendants A and B, admitting testimony from a third party that A made certain statements incriminating both himself and B would violate B's sixth amendment right of confrontation unless A testified, thereby becoming subject to B's cross-examination."), *cert. denied*, —— U.S. ——, 108 S.Ct. 1245, 99 L.Ed.2d 443 (1988).

party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject."

*United States v. Peco,* 784 F.2d 798, 805 (7th Cir.) (quoting *United States v. Carter,* 720 F.2d 941, 948 (7th Cir.1983) (citation omitted)), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986); *see also United States v. Wynn,* 845 F.2d 1439, 1443 (7th Cir.1988) ("It is clear from the record that [the defendant] opened the door to this line of questioning when he tried to impeach [the government agent] on the issue of his motive for investigating [the defendant]. By questioning [the agent's] motives, [defendant's] counsel was attempting to further his own theory that [defendant] was framed.... On redirect examination the government merely clarified the basis for [the agent's] suspicion of [the defendant]."); *United States v. Taylor,* 716 F.2d 701, 710 (9th Cir.1983) (Where the "defense counsel 'opened the door' to [the] line of questioning ... the trial court did not abuse its discretion in permitting the question.") (citing *United States v. Millican,* 424 F.2d 1038, 1039–40 (5th Cir. 1970)); *accord Allen v. Morris,* 845 F.2d 610, 616 (6th Cir.1988) (criminal defendant bound by counsel's strategic trial decisions regarding evidentiary matters) (quoting *Trussell v. Estelle,* 699 F.2d 256, 262 n. 4 (5th Cir), *cert. denied,* 464 U.S. 853, 104 S.Ct. 168, 78 L.Ed.2d 153 (1983)), *petition for cert. filed,* (July 15, 1988); *Taylor v. Illinois,* — U.S. —, —, 108 S.Ct. 646, 657, 98 L.Ed.2d 798 (1988) (same).

Furthermore, even were this court to conclude that the district court had erred in refusing the requested *Bruton* instruction, it was harmless in light of the weight of the evidence adduced by the government during the course of the trial. *See Cruz v. New York,* 481 U.S. 186, 191, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Hodges v. Rose,* 570 F.2d 643, 647 (6th Cir.) ("The error in admitting the incriminating portion of [the defendant's] statement as to [the co-defendant] was therefore harmless be-

yond a reasonable doubt."), *cert. denied sub nom. Lewis v. Rose,* 436 U.S. 909, 98 S.Ct. 2243, 56 L.Ed.2d 408 (1978).

This court has considered the defendants' remaining assignments of error and has concluded that they are without merit. Accordingly, the judgments of conviction entered against the defendants Ramos, Sutton and Longmire, pursuant to the jury's verdicts, are hereby AFFIRMED.