25 F.3d 1051
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Kenneth Duane LENNOX, Defendant-Appellant.
 No. 93-2216.
 United States Court of Appeals, Sixth Circuit.
 June 2, 1994.
 
 Before: MARTIN, NORRIS, and DAUGHTREY, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 Kenneth Duane Lennox appeals his conviction and sentence for armed bank robbery and use of a firearm in the commission of the robbery. Lennox alleges that the district court erred in admitting evidence concerning the location from which police recovered a shotgun, and in refusing to instruct the jury that Lennox was not required to prove his alibi defense and that prior statements could be used to impeach a government witness. For the following reasons, we affirm the judgment of the district court.
 
 
 2
 * On February 16, 1993, at approximately 1:30 p.m., Lennox entered the Carleton Road Branch of the Old Kent Bank of Hillsdale in Hillsdale, Michigan, demanded money, and threw a plastic bag in the direction of bank employee Sonya Lee Hannibal. Lennox was carrying a sawed-off shotgun and wearing a blond wig, sunglasses, a plaid shirt, black boots, and dark-colored gloves. At the time, only Hannibal and fellow employee Marilyn Joyce Stewart were present in the bank. After ordering Hannibal and Stewart to fill the bag with money from a cash drawer and the bank's vault, Lennox forced both employees into a bathroom and made his escape by car. Included in the $96,839.00 stolen by Lennox were ten one-hundred dollar "bait bills," which had been previously photocopied by a bank employee.
 
 
 3
 At approximately 2:00 p.m. that same day, Linda Cleveland, Lennox's ex-wife, was driving north on Carleton Road towards Jonesville, Michigan, with their eighteen-year-old daughter, Michelle Lennox, and saw Lennox stopped at an intersection in an automobile belonging to his mother, Catherine Lennox. At Cleveland's request, Lennox followed her to the Jonesville Apartments, an apartment complex managed by Lennox. There, and again later that day at Lennox's home, Lennox and Cleveland discussed the fact that Lennox had previously withdrawn all of the money from a conservatorship that had been established for Michelle in 1982 with approximately $20,000.
 
 
 4
 On February 17, Lennox contacted Michelle directly and informed her that he planned to pay her, in cash, the missing money from her conservatorship. Pursuant to her mother's wishes, however, Michelle informed Lennox that cash would be unacceptable, and that any payment would have to be made by check.
 
 
 5
 On March 2, the Michigan State Police learned from Jerre Murray, an acquaintance of Lennox's, that Lennox had announced his intention to rob the Old Kent Bank of Hillsdale during a February 11 encounter with Murray at a local restaurant called the Hunt Club. Roger Dryer, a friend of Lennox's, was also present during this conversation. Special Agent Peter J. Engley of the Federal Bureau of Investigation subsequently contacted Dryer and inquired as to whether he had any reason to believe that Lennox had been involved in the February 16 bank robbery. Dryer responded that he did not.
 
 
 6
 On March 12, Lennox purchased two money orders, one for $500 and one for $465, from the Security State Savings Bank in Jackson, Michigan. In making this purchase, Lennox used six one hundred-dollar bills that were later identified as part of the bait money taken in the bank robbery. On March 13, Lennox was arrested.
 
 II
 
 7
 On April 12, a federal grand jury returned an indictment charging Lennox with one count of armed bank robbery, in violation of 18 U.S.C. Sec. 2113(a) and (d), and one count of using a firearm in the commission of a crime of violence, in violation of 18 U.S.C. Sec. 924(c). A jury trial began on June 23.
 
 
 8
 At trial, Sergeant Edward Busch, a fingerprint expert with the state police, testified that Lennox's palm print was found on one of the recovered bait bills. In response to a question posed by defense counsel on cross-examination concerning whether Busch had tested "three or four other items" submitted for fingerprint analysis, Busch noted that he had also analyzed a sawed-off shotgun recovered by police, but that he had obtained no latent prints from that weapon. Subsequently, during cross-examination of Special Agent Engley, defense counsel again asked about the shotgun to which Sergeant Busch had referred. Finally, on redirect examination of Engley, the government elicited additional testimony that the shotgun in question had been found under a bush in a residential area of Tecumseh, Michigan.
 
 
 9
 In Lennox's defense, Carson Lambert and James Murray testified that Lennox was at the Jonesville Apartments when they began plowing snow there at approximately 12:30 p.m. on the day of the bank robbery. According to Lambert and Murray, moreover, Lennox was still present at the complex when they departed at 1:32 p.m. In explaining the significance of this alibi defense to the jury, the district court relied on a pattern criminal jury instruction (i.e. SIXTH CIRCUIT DISTRICT JUDGES ASSOCIATION, PATTERN CRIMINAL JURY INSTRUCTIONS 129 (1991) (No. 6.02)) and instructed the jury as follows:
 
 
 10
 One of the questions, then, in this case is whether the Defendant was present at the time the bank was robbed. Now, the government has the burden of proving that the Defendant was present at that time and place. Unless the government proves this beyond a reasonable doubt, you must find the Defendant not guilty.
 
 
 11
 The court declined Lennox's request for a modification to the instruction that would have added: "You should not connote any negative implication to the word 'alibi'. An alibi is a proper and legitimate claim in defense of an indictment. United States v. Alston, 551 F.2d 315, 317 (D.C.Cir.1976)."
 
 
 12
 Finally, both Roger Dryer and Michelle Lennox appeared as government witnesses at trial. Dryer testified that during his conversation with Lennox and Murray at the Hunt Club on February 11, Lennox talked about robbing the Old Kent Bank in Hillsdale. Moreover, Dryer testified that Lennox showed Dryer a gun that Lennox claimed he could use to perpetrate the robbery. Under cross-examination, Dryer admitted that he had not told the "full truth" when first questioned by Special Agent Engley about Lennox's potential involvement in the bank robbery. Michelle Lennox, in turn, testified on cross-examination that she saw her father traveling towards the Jonesville Apartments at "about quarter to 2:00" on the day of the robbery. On redirect, Michelle admitted that she testified before the grand jury that she had seen her father that same day at "around 2:00." Michelle denied telling her mother that Lennox had told her to change her testimony concerning the time at which she had initially seen him.
 
 
 13
 With respect to the proper purpose for which the jury could consider Michelle's prior inconsistent statement to the grand jury, the district court relied once again on a pattern instruction (i.e. DISTRICT JUDGES ASSOCIATION, supra, at 145 (No. 7.04)) and instructed the jury in the following manner:
 
 
 14
 You have heard the testimony of one witness, Michelle Lennox. You also heard that before this trial she made a statement that may be different from her testimony here in court. This earlier statement was brought to your attention only to help you decide how believable her testimony was. You cannot use her earlier testimony as proof of anything else. You can use it only as one way of evaluating the testimony that you heard here in this court.
 
 
 15
 In formulating this instruction, the court rejected Lennox's request specifically to identify Roger Dryer to the jury as a witness who also had been impeached by prior inconsistent statements. The court explained that Dryer's initial statement that he had no reason to believe that Lennox was involved in the bank robbery and his testimony at trial concerning the conversation at the Hunt Club did not constitute an instance of "true impeachment," and thus "stood on a different footing" than Michelle's admission that she made a statement to the grand jury concerning when she first saw her father that directly conflicted with her trial testimony on that same issue.
 
 
 16
 The jury found Lennox guilty on both counts of the indictment on June 30. On September 3, the district court sentenced Lennox to a total of twelve years of imprisonment, ordered him to pay restitution in the amount of $96,839.00, and fined him $1,000. This timely appeal followed.
 
 III
 
 17
 * Lennox argues that the district court erred in allowing the government to elicit testimony from Special Agent Engley concerning the location from which the police recovered the shotgun that was submitted for fingerprint analysis. According to Lennox, this testimony should have been excluded either under Federal Rule of Evidence 402, as irrelevant, or under Federal Rule of Evidence 403, as substantially more prejudicial than probative. This Court reviews evidentiary rulings pursuant to Rules 402 and 403 for abuse of discretion, and we have emphasized our particular deference to a district court's determinations under these rules. See United States v. Seago, 930 F.2d 482, 494 (6th Cir.1991) (trial court's determinations of admissibility and relevance should not be disturbed absent a clear abuse of discretion); United States v. Moore, 917 F.2d 215, 233 (6th Cir.1990) (noting that in reviewing a trial court's admissibility determination under Rule 403, "the appellate court must view the evidence in the light most favorable to its proponent, giving 'the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.' " (citation omitted)), cert. denied, 499 U.S. 963 (1991).
 
 
 18
 This Court addressed an admissibility of evidence claim similar to Lennox's in United States v. Ramos, 861 F.2d 461, 467-68 (6th Cir.1988), cert. denied, 489 U.S. 1071 (1989). In that case, a confession by Ramos implicated both of his codefendants. Because Ramos chose not to testify at trial, the district court cautioned the government, pursuant to Bruton v. United States, 391 U.S. 123 (1968), to avoid any reference to the confession. In the course of cross-examining one of the investigating agents, however, defense counsel repeatedly inquired as to the agent's source of information concerning the defendants' criminal activities. Accordingly, on redirect, the government elicited testimony that Ramos had identified his codefendants in a confession as his cocaine customers. On appeal, this Court upheld the district court's finding that the testimony elicited on redirect was admissible, notwithstanding Bruton, because defense counsel had "opened the door" by questioning the agent about Ramos' confession on cross-examination. As a result, this Court found, the government was entitled "to clarify any misconception created by" defense counsel. Ramos, 861 F.2d at 468.
 
 
 19
 Here, Lennox stresses that defense counsel asked Sergeant Busch only whether Busch had tested the "three or four other items" that had been submitted for fingerprint analysis, and that it was Busch who in response first identified the shotgun as one of these items. Initially, we note that, despite defense counsel's protestations to the contrary, his cross-examination of Busch came perilously close to opening the door to testimony regarding the shotgun. More importantly, the government subsequently introduced the testimony Lennox specifically challenges, concerning the location from which the police recovered the shotgun, only on redirect examination, after defense counsel asked Special Agent Engley on cross: "You found a shotgun that Sergeant Busch testified about, right?" This further reference by Lennox to the shotgun may well have created a misconception that the government was suppressing evidence unfavorable to its case. Special Agent Engley's brief testimony on redirect indicating that the weapon was found under a bush in a residential area in Tecumseh served the limited purpose of clarifying only that the location from which the shotgun was recovered, like the absence of latent fingerprints on the weapon, was consistent with the premise that neither the defendant nor any other individual used it to commit the bank robbery at issue. See Ramos, 861 F.2d at 468 (testimony concerning confession proper to clarify misconception created by challenges to government witness' source of information). Thus, the potential misconception created by defense counsel's cross-examination of Special Agent Engley made relevant the location from which the weapon was recovered. Because Engley's testimony in this regard was not more prejudicial than probative, we conclude that the district court did not abuse its discretion in admitting the location evidence.
 
 
 20
 Finally, even if the district court did err in admitting this evidence, given the substantial other evidence against Lennox,[1] and the fact that the shotgun was not linked to him, such error was harmless. See United States v. Baro, 15 F.3d 563, 568 (6th Cir.1994) (finding admission of tainted evidence to be harmless error given extensive other evidence supporting defendant's guilt).
 
 B
 
 21
 Next, Lennox challenges the district court's decision not to instruct the jury that: (1) Lennox was not required to prove his alibi defense; and (2) Dryer's prior statements could be used to impeach his testimony. This Court reviews jury instructions "as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in law to aid the jury in reaching its decision." United States v. Clark, 988 F.2d 1459, 1468 (6th Cir.), cert. denied, 114 S.Ct. 105 (1993). Additionally, we "may reverse a judgment only if the instructions, viewed as a whole, were confusing, misleading and prejudicial." Id.; see also United States v. Wolak, 923 F.2d 1193, 1198 (6th Cir.) (where the evidence against a defendant is substantial, district court's failure to give instruction may constitute harmless error), cert. denied, 501 U.S. 1217 (1991).
 
 
 22
 Relying exclusively on United States v. Alston, 551 F.2d 315 (D.C.Cir.1976), Lennox argues that the district court erred in refusing to instruct the jury that there is no negative implication to the word "alibi," and that an alibi is a proper and legitimate claim in defense of an indictment. Alston, however, is easily distinguishable from the present case.
 
 
 23
 In Alston, the trial court instructed the jurors, in considering the defendant's alibi defense, simply "to analyze the testimony presented by him and his witnesses in contradistinction to the testimony presented by the Government." Id. at 317. Moreover, the court only expressly advised the jury that the government bore the burden of proving one of the four elements of the charged robberies beyond a reasonable doubt. At the start of the trial, finally, the court also referred to the government's "initial" burden of proof, implying erroneously that the burden somehow shifted to the defendant over the course of the proceedings. As these instructions created confusion regarding the proper allocation of the burden of proof, the Alston court held that it was:
 
 
 24
 not convinced that the jurors fully appreciated that appellant's alibi evidence need only raise a reasonable doubt in their minds that the defendant was present at the crime scene; that they must consider the evidence in its totality, including the alibi evidence, in deciding defendant's guilt; and that the burden of proof never shifts.
 
 
 25
 Id. at 319. Noting that the government's case rested solely on the victims' identification testimony, the appellate court concluded that, under the circumstances, the jury might have been led to believe that the appellant assumed the burden of proof by volunteering an alibi. As a result, the court found that the instructions constituted reversible error.
 
 
 26
 Here, by contrast, the district court's instruction on the alibi defense made abundantly clear that the government continuously bore the burden of proof beyond a reasonable doubt. Lennox's proposed modification, furthermore, did not even pertain to the burden of proof issue raised in Alston. Because the district court's actual jury instructions, taken as a whole, adequately informed the jury of the relevant considerations, and provided a sound basis in the law to aid the jury in reaching its decision, the district court did not err in refusing to give Lennox's proposed alibi defense instruction.
 
 
 27
 Lennox's final contention is that the district court erred in instructing the jury on the impeachment of Michelle Lennox by prior inconsistent statements because it did not also identify Roger Dryer as subject to the same form of impeachment. In response, the government argues that Dryer's trial testimony as to Lennox's previous statements regarding a possible robbery of the Old Kent Bank, with a weapon that Lennox possessed, did not directly contradict Dryer's initial statement to Special Agent Engley that Dryer had no reason to believe that Lennox committed the bank robbery. On the other hand, the government maintains, Michelle's trial testimony that she first saw her father on the day of the bank robbery at "about quarter to 2:00" directly contradicted her statement to the grand jury that she first saw him at "around 2:00." The government therefore concludes that because Michelle made two facially inconsistent statements, and Dryer did not, the district court did not err in instructing the jury on Michelle's impeachability by prior inconsistent statement, but not on Dryer's.
 
 
 28
 As a preliminary matter, the instruction challenged here is more aptly characterized as a limiting instruction on the proper use of Michelle's prior statement to the grand jury than as a comment on her credibility.[2] In addition, the district court gave a separate general instruction regarding the credibility of witnesses that was not limited to any witnesses in particular and accurately stated the jury's responsibility in considering prior inconsistent statements. Accordingly, we conclude that the district court's actual instructions, taken as a whole, were not "confusing, misleading, and prejudicial." Clark, 988 F.2d at 1468.
 
 
 29
 Because we find that the district court did not commit reversible error in instructing the jury, we need not consider the accuracy of the court's determination that the inconsistency between Michelle's statements was qualitatively different from any inconsistency between Dryer's.
 
 IV
 
 30
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 [1]
 The evidence against Lennox included the following facts: (1) he told Murray and Dryer that he planned to rob the bank; (2) he was found in possession of money taken in the robbery; (3) he matched the physical description of the robber and, on the day of the robbery, wore clothing similar to the robber's; (4) tire track measurements of the suspect vehicle were consistent with those of the car he was seen driving on the day of the robbery; (5) he needed money to replenish Michelle's depleted conservatorship; and (6) he was in possession of large amounts of cash following the robbery
 
 
 [2]
 Notably, the statement that Lennox contends the district court should have included in its instruction on the limited use of prior inconsistent statements was Dryer's claim that he had no reason to believe that Lennox robbed the Old Kent Bank. Because the court failed to instruct the jury to consider this statement only in assessing the credibility of Dryer's trial testimony, the error Lennox is alleging must be that the jury also could have considered this statement for its truth--as evidence that Lennox did not rob the bank. Accordingly, if the court did err in this regard, such error was to Lennox's benefit